El Juez Asociado Señor Rivera García
emitió la opinión del Tribunal.
La corporación San Gerónimo Caribe Project, Inc. (SGCP) nos solicita que revoquemos dos recalificaciones de la Registradora de la Propiedad de la Sección Primera de San Juan, Hon. Marisol Marchand (Registradora). En es-tas, la Registradora denegó la inscripción de la declaración de edificación, la compraventa de finca y estacionamiento comercial, la constitución del derecho de superficie, la constitución del Régimen de Propiedad Horizontal, entre otros, por insuficiencia en el pago de derechos de inscripción. En ese contexto, estos recursos gubernativos nos proveen la oportunidad de expresamos en cuanto al alcance e interpretación de la Norma Duodécima del Art. 2 *853 de la Ley de Aranceles del Registro de la Propiedad, 30 LPRA sec. 1767(b) (Norma Duodécima). Específicamente esta normativa dispone:
En caso de enajenación, cesión o compraventa de fincas gra-vadas con hipotecas según el Registro de la Propiedad, de no constar del documento la inclusión de dichas hipotecas en el precio de venta, se tomará como base el precio de enajenación, cesión o compraventa o la suma total de las hipotecas, lo que resulte mayor a los efectos de la cancelación de los correspon-dientes derechos de inscripción. (Énfasis suplido).
Examinados ambos recursos decidimos consolidarlos por presentar controversias similares. Luego de analizar con rigor el estado de derecho aplicable, adelantamos que confirmamos la calificación de la Registradora. Pasemos a dilucidar los escenarios fácticos que dan lugar a esta controversia.
I

RG-2013-003

La SGCP es titular de una finca de 6,098.9650 metros cuadrados (equivalentes a 1.5517 cuerdas) en el área de San Juan en la cual desarrolló un proyecto mixto consti-tuido por una edificación comercial y un estacionamiento. Este se construyó bajo la edificación comercial y corres-ponde al condominio residencial denominado Laguna Plaza. El condominio Laguna Plaza consta de nueve plan-tas en las que ubican treinta y tres unidades de aparta-mentos destinados a uso residencial. Esa edificación co-mercial no es parte del inmueble y constituye una finca separada e independiente. Ahora bien, el estacionamiento para el condominio Laguna Plaza, ubicado en el sótano de la estructura total, sí es parte del condominio. La edifica-ción comercial y el condominio Laguna Plaza fueron con-ceptualizados como unidades económicas independientes. Para el financiamiento de la estructura total, SGCP obtuvo *854 préstamos garantizados con hipotecas por la suma de $73,126,636 para la construcción tanto de la edificación co-mercial, como del condominio Laguna Plaza.
El 18 de junio de 2009, luego de finalizar la construcción de la edificación comercial y del condominio Laguna Plaza, SGCP presentó en el Registro de la Propiedad la Escritura Núm. 2, objeto de la calificación y la denegatoria de reca-lificación recurrida. Mediante la escritura, SGCP llevó a cabo los actos siguientes: (1) declaró la existencia de la edificación comercial sobre la finca de 6,098.9650 metros cuadrados (equivalentes a 1.5517 cuerdas); (2) vendió la finca y la edificación comercial (pero no el condominio) a San Gerónimo Caribe Parking, Inc. (SGC Parking), una afiliada de SGCP; (3) se reservó un derecho de superficie sobre la cubierta de la primera y única planta de la edifi-cación comercial, en la que se apoya el condominio y el sótano donde ubican los estacionamientos del condominio Laguna Plaza; (4) inscribió trece servidumbres; (5) sometió las nueve plantas construidas sobre la edificación comer-cial al derecho de superficie y el sótano donde ubican los estacionamientos para los residentes del condominio al Ré-gimen de Propiedad Horizontal.
Por su parte, los valores atribuidos a los actos instru-mentados mediante la Escritura Núm. 2 son los siguientes: (1) la edificación comercial se valoró en $11,000,000, según una carta de valor emitida por los tasadores para ese in-mueble; (2) la compraventa de la edificación comercial de SGCP a SGC Parking se valoró en $11,000,000; (3) el dere-cho de superficie sobre la edificación comercial fue valo-rado en $1,000; (4) cada una de las servidumbres se valoró en $1,000, ascendiendo a un total de $13,000 por las trece servidumbres, y (5) el condominio Laguna Plaza fue valo-rado en $33,065,000, en conformidad con la tasación pre-parada por Luis E. Vallejo, M.A.I., de la firma Vallejo & Vallejo. En vista de ello, el valor total de las transacciones consignadas en la escritura fue de $55,079,000.
*855 Este fue el valor que utilizó como base para calcular y pagar los derechos de inscripción de $220,270. Al someter la Escritura Núm. 2 no se había liberado ninguna parte del negocio expuesto de la suma total de los préstamos garan-tizados con hipotecas. Estos préstamos se habían obtenido para financiar la construcción tanto de la edificación co-mercial como del condominio Laguna Plaza. Así, al mo-mento de presentarse la referida escritura, tanto la finca y la edificación comercial, como el condominio Laguna Plaza, estaban gravados con hipotecas que sumaban $73,126,636. Al presentar ante el Registro de la Propiedad la Escritura Núm. 2, se cancelaron las sumas de derechos de inscrip-ción siguientes: (1) por la declaración de la existencia de la edificación comercial, valorada en $11,000,000, se pagaron $43,950; (2) por la compraventa de la finca y edificación comercial, valorada en $11,000,000, se pagaron $43,950; (3) por el derecho de superficie sobre la edificación comer-cial, valorado en $1,000, se pagaron $2; (4) por las servi-dumbres, valoradas en $13,000, se pagaron $26, y (5) por la constitución del Régimen de Propiedad Horizontal sobre el condominio Laguna Plaza, se pagaron $132,210.
Así las cosas, el 17 de enero de 2013, durante el proceso de calificación de la escritura, la Registradora razonó que según la Norma Duodécima, se debía valorar la compra-venta de la finca y la edificación comercial (que se había llevado a cabo por $11,000,000) en $73,126,636. Ello así, porque las hipotecas que SGCP había constituido para fi-nanciar el desarrollo completo y efectuar todas las transac-ciones incluidas en la escritura sumaban en total $73,126,636.
Por su parte, SGCP sostuvo que al así obrar, la Regis-tradora obvió el hecho de que las hipotecas se habían cons-tituido para financiar la construcción del proyecto en su totalidad y de los derechos contenidos en la escritura. A su vez, entendió que el valor total de los componentes y dere-chos comprendidos en la escritura es de $55,079,000, a *856 base de los cuales se pagaron derechos de inscripción, y que debía distribuirse proporcionalmente a través de las transacciones efectuadas.
El 5 de febrero de 2013, SGCP presentó una solicitud de recalificación y el 28 de febrero de 2013 la Registradora notificó la calificación final denegándola. Como consecuen-cia de la decisión de la Registradora, se denegó la inscrip-ción de: (1) la edificación comercial declarada; (2) el domi-nio sobre la finca y la edificación comercial; (3) el derecho de superficie sobre la edificación comercial; (4) las servi-dumbres, y (5) el Régimen de Propiedad Horizontal para el condominio Laguna Plaza. Insatisfecho con ese dictamen, SGCP recurre mediante un recurso gobernativo y puntua-liza que la Registradora erró al requerir derechos de ins-cripción de $248,376 adicionales a los $220,270 ya pagados por SGCP. En atención a ello, solicita que revoquemos la Calificación Final.

RG-2013-004

Por otro lado, SGCP es dueño de una finca de 6,588.8785 metros cuadrados (equivalentes a 1.6763 cuer-das) en el área de San Juan en la cual desarrolló un pro-yecto mixto compuesto de un estacionamiento comercial, un condominio residencial llamado Caribe Plaza, que está construido sobre una porción de la última planta del esta-cionamiento comercial, y un estacionamiento correspon-diente al condominio residencial que construyó debajo del estacionamiento comercial sometido al derecho de superficie. El estacionamiento comercial cuenta con ocho plantas y el condominio Caribe Plaza consta de catorce plantas, en las que ubican cuarenta y siete unidades de apartamentos destinados a uso residencial. Además, este último tiene un estacionamiento para los residentes que está localizado en el sótano de la estructura total, es decir, debajo del estacionamiento comercial. El estacionamiento comercial sobre el cual se construyó el condominio Caribe *857 Plaza no es parte de ese condominio y constituye una finca separada e independiente. Empero, el estacionamiento para ese Condominio, ubicado en el sótano de la estructura total, sí lo es. En otras palabras, el estacionamiento comer-cial y el condominio Caribe Plaza se conceptualizaron como unidades económicas independientes.
Para el financiamiento de la estructura total, SGCP ob-tuvo préstamos garantizados con hipotecas por la suma de $95,050,000 para la construcción tanto del estaciona-miento comercial, como del condominio Caribe Plaza. El 23 de julio de 2007, luego de finalizar la construcción en su totalidad, SGCP presentó ante el Registro de la Propiedad, la Escritura Núm. 10, objeto de la calificación y denegato-ria de recalificación de la que se recurre.
Mediante el referido instrumento público, SGCP llevó a cabo los actos siguientes: (1) declaró la existencia del esta-cionamiento comercial sobre la finca de 6,588.8785 metros cuadrados (equivalentes a 1.6763 cuerdas); (2) vendió la finca y el estacionamiento comercial (pero no el condomi-nio) a SGC Parking; (3) se reservó un derecho de superficie sobre la cubierta de la octava y última planta del estacio-namiento comercial, en la que se apoya el condominio y sobre el sótano donde ubican los estacionamientos del con-dominio Caribe Plaza; (4) inscribió doce servidumbres, y (5) sometió las catorce plantas construidas sobre el estacio-namiento comercial al amparo del derecho de superficie y el sótano en donde ubican los estacionamientos para los residentes de ese condominio al Régimen de Propiedad Horizontal.
Los valores atribuidos a los actos llevados a cabo me-diante la Escritura Núm. 10 son los siguientes: (1) el esta-cionamiento comercial de cuya existencia se dio fe se va-loró en la cifra de $19,040,000, ello porque el permiso de construcción para ese estacionamiento y sobre el cual se pagaron los correspondientes arbitrios de construcción era por esa cantidad; (2) la compraventa del estacionamiento *858 comercial de SGCP a SGC Parking fue por $19,040,000; (3) el derecho de superficie sobre el estacionamiento comercial fue valorado en $1,000; (4) cada una de las servidumbres se valoró en $1,000, ascendiendo a un total de $12,000 por las doce servidumbres; (5) el condominio Caribe Plaza fue valorado en $86,000,000 según la tasación preparada por Luis E. Vallejo, de la firma Vallejo & Vallejo. Así pues, el valor total de todas las transacciones expuestas en la Escritura Núm. 10 ascendió a $124,093,000. Consecuen-temente, los derechos de inscripción que SGCP pagó por la Escritura Núm. 10 se calcularon a base de esa cifra de $124,093,000.
Al momento de presentar la Escritura Núm. 10 no se había liberado ninguna parte del negocio expuesto de la suma total de los préstamos garantizados con hipotecas que se habían obtenido para poder financiar la construc-ción tanto del estacionamiento comercial como del condo-minio Caribe Plaza. Así, al momento de presentarse la re-ferida escritura, la finca, el estacionamiento comercial y el condominio Caribe Plaza estaban gravados por hipotecas que sumaban $95,050,000.
Al presentar ante el Registro de la Propiedad la Escri-tura Núm. 10, se pagaron las cantidades siguientes por de-rechos de inscripción: (1) por la declaración de la existencia del estacionamiento comercial, valorado en $19,040,000, se pagaron $76,110; (2) por la compraventa de la finca y del estacionamiento comercial, valorado en $19,040,000, se pa-garon $76,110; (3) por el derecho de superficie sobre el esta-cionamiento comercial, valorado en $1,000 se pagaron $2; (4) por las servidumbres, valoradas en $12,000, se pagaron $24, y (5) por la constitución del Régimen de Propiedad Horizontal sobre el componente del condominio Caribe Plaza, se pagaron $343,950. En vista de lo anterior, SGCP pagó derechos de inscripción por un total de $496,322, los cuales fueron pagados a base de una cifra total de $124,093,000, *859 que, según SGCP, es la suma de los valores de las distintas transacciones contenidas en la Escritura Núm. 10.
Así las cosas, el 17 de enero de 2013, la Registradora notificó dos defectos relacionados con la escritura objeto de este recurso: (1) la ausencia de un comprobante por $303,914 para completar los derechos de inscripción y (2) unas diferencias entre la escritura matriz y los planos o “plot plans” de ciertas unidades del condominio Caribe Plaza.(1) En cuanto al primer defecto, la Registradora coligió que el pago de los derechos era necesario en conformidad con la Norma Duodécima del Art. 2 de la Ley Hipotecaria y del Registro de la Propiedad, según enmendada (Ley Hipotecaria). También razonó que se le debía atribuir el valor de la suma de las hipotecas ($95,050,000) que garantiza-ban los préstamos obtenidos para la construcción de la es-tructura total (estacionamiento comercial y condominio Caribe Plaza) y la constitución de todos los derechos expre-sados en la Escritura Núm. 10 únicamente a la compra-venta de la finca y el estacionamiento comercial.
Oportunamente, el 5 de febrero de 2013 SGCP presentó un escrito de recalificación en el que adujo que el primer error notificado, es decir, la ausencia de un comprobante por $303,914 para completar los derechos de inscripción, era improcedente en derecho. En síntesis, SGCP argüyó que la postura de la Registradora al notificar la falta de comprobante por $303,914 es contraria a la ley y a la in-tención legislativa. Además, sostuvo que tal determinación lleva a resultados irrazonables, ello puesto que SGCP ya había pagado derechos de inscripción sobre una base total de $124,093,000.
*860 El 28 de febrero de 2013, la Registradora notificó una denegatoria final de la inscripción solicitada por faltar un comprobante de $303,914 para completar los derechos de inscripción. Como consecuencia, se denegó la inscripción de: (1) la edificación comercial (el estacionamiento comer-cial) declarada; (2) la inscripción del dominio sobre la finca y el estacionamiento comercial; (3) el derecho de superficie sobre el estacionamiento comercial; (4) las servidumbres, y (5) el Régimen de Propiedad Horizontal para el condominio Caribe Plaza. Consecuentemente, ninguna de las compra-ventas de los distintos apartamentos que componen el con-dominio Caribe Plaza ha tenido acceso al Registro. Por su parte, SGCP objetó la calificación efectuada por la Regis-tradora en cuanto requirió derechos de inscripción adicio-nales a los ya pagados en la suma de $303,914. También entendió que aplicó e interpretó la Norma Duodécima in-correcta y mecánicamente a una de las transacciones efec-tuadas mediante la Escritura Núm. 10, y, además, obvió interpretar y aplicar esa norma de forma cónsona con su propósito.
Expuestos los escenarios fácticos que dan lugar a estos recursos gubernativos, pasemos a expresar el derecho apli-cable a las controversias presentadas.
II
A. Principio de legalidad registral
El principio de legalidad exige que los títulos que pretendan ingresar en el Registro sean sometidos a un examen o calificación. L.R. Rivera Rivera, Derecho registral inmobiliario puertorriqueño, 3ra ed., San Juan, Jurídica Eds., 2012, pág. 271. En cuanto al principio de legalidad, en la obra Derecho hipotecario podemos apreciar que
[e]l principio de legalidad, en lo qne atañe a la publicidad re-gistral inmobiliaria, es el que impone que los títulos que pre- *861 tendan su inscripción en el Registro de la Propiedad sean so-metidos a un previo examen, verificación o calificación, a fin de que en los libros hipotecarios solamente tengan acceso los títulos válidos y perfectos, interna o materialmente y externa o formalmente. R. Roca Sastre y otros, Derecho hipotecario, 9na ed., Barcelona, Ed. Bosch, 2008, T. I, pág. 614.
Entre los asuntos que el Registrador tiene que verificar al calificar un documento presentado en el Registro de la Propiedad figura el pago de los derechos de inscripción correspondientes.
La Ley Núm. 91 de 30 de mayo de 1970, según enmendada, conocida como Ley de Aranceles del Registro de la Propiedad (Ley de Aranceles), 30 LPRA secs. 1767a-1767e, regula los derechos que se pagarán por las operaciones del Registro de la Propiedad. Estos preceptos fijan los derechos que se pagarán cuando se solicita una inscripción, anotación, cancelación o liberación en el Registro de la Propiedad. ESJ Towers, Inc. v. Registrador, 150 DPR 298, 311 (2000). Hemos reconocido que la Ley de Aranceles es un estatuto tributario, por lo que los aranceles tienen el carácter de contribución. Díaz v. Registrador, 107 DPR 233, 238 (1978). No obstante, cabe destacar que esta ley tiene entre sus propósitos eliminar la doble tributación y evitar el cobro “mecánico” de aranceles respecto a los derechos en sí. Esto es así ya que la legislación contributiva no se puede interpretar extensivamente, sino de forma justa y según sus propios términos para que toda ambigüedad se interprete restrictivamente contra el Estado y a favor del ciudadano. IFCO Recycling v. Aut. Desp. Sólidos, 184 DPR 712, 741 (2012); Pagán Rodríguez v. Registradora, 177 DPR 522, 537 (2009); B.B.C. Realty v. Secretario Hacienda, 166 DPR 498, 511 (2005).
En cuanto a este asunto, en S.B. Pharmco P.R., Inc. v. Registrador, 148 DPR 336, 348 (1999), dijimos que “[e]l valor del arancel registral requerido para la inscripción o cancelación de cualquier asiento, ya sea el principal *862 o accesorio, queda establecido en virtud del valor de la finca o del derecho a inscribirse o a cancelarse”.
Al computar los derechos de inscripción que corresponde para cada transacción es preciso referirnos al texto de la Norma Duodécima que expresa lo siguiente:
En caso de enajenación, cesión o compraventa de fincas gra-vadas con hipotecas según el Registro de la Propiedad, de no constar del documento la inclusión de dichas hipotecas en el precio de venta, se tomará como base el precio de enajenación, cesión o compraventa o la suma total de las hipotecas, lo que resulte mayor a los efectos de la cancelación de los correspon-dientes derechos de inscripción. (Enfasis suplido).
La citada norma responde al propósito legislativo de que el arancel se aplique sobre la base que mejor refleje el valor en el mercado de la propiedad transmitida. Somohano v. Registrador, 39 DPR 774, 775 (1929). Por ello, hemos reafirmado que si en la venta, voluntaria o forzosa, de la finca hipotecada, subsisten gravámenes anteriores y preferentes, los derechos de registro se gravarán conforme a esa norma. Aponte Parés v. Registrador, 106 DPR 176, 179 (1977).
Asimismo, hemos ratificado que el propósito moderno e irreversible que infiltra el arancel es aproximar en lo posible la base impositiva al valor real del derecho objeto de la operación registral. Aponte Parés v. Registrador, supra; Empire Life Ins. Co. v. Registrador, 105 DPR 136, 140 (1976). Como observamos, la doctrina jurisprudencial no deja al azar ni a la voluntad de las partes la valoración del derecho objeto de inscripción. De otra parte, se puede instar un recurso gubernativo ante este Tribunal cuando el presentante entienda que el Registrador de la Propiedad ha establecido erróneamente el pago de derechos que devenga una operación en el Registro de la Propiedad. Art. 4 de la Ley de Aranceles, 30 LPRA sec. 1767d; Art. 74 de la Ley Hipotecaria, 30 LPRA sec. 2227; *863 Pagán Rodríguez v. Registradora, supra, pág. 526; Chase Manhattan Bank v. Registrador, 98 DPR 92, 95 (1969).
Por otro lado, en Empire Life Ins. Co. v. Registrador, supra, no quedaba gravamen subsistente, pues se trataba de una primera hipoteca ejecutada en subasta. En ese caso se tomó como valor del inmueble y base para cómputo de derechos de arancel, el principal de la hipoteca ejecutada en lugar del precio del importe de la licitación que obtuvo la buena pro en la subasta.
No encontramos razón en la contención de la recurrente que propone reducir la base de cómputo del arancel a dos por ciento (2%) del principal de la hipoteca, elemento representa-tivo del verdadero valor del inmueble ejecutado que consiste en 3.22 cuerdas bordeadas por el Atlántico y la Laguna del Condado en el norte de la Avenida Ashford del Condado, San Juan, solar sobre el que se ha edificado un hotel de turismo. Tampoco se cumple el principio de legalidad ajustando el cobro de derechos a la desproporción resultante de pagar $150,000 por lo que fue buena garantía de $7,000,000. Empire Life Ins. Co. v. Registrador, supra, pág. 141.
Siendo la calificación función de raciocinio, la Registra-dora concluyó correctamente que la cifra mayor es más re-presentativa del valor implicado en la operación del Registro y, por lo tanto, sujeto al arancel. Mencionamos que, “[a]l así calificar, la Registradora sólo cumplió con el deseable objetivo de excluir la ficción y abrir el Registro a la reali-dad del verdadero valor del inmueble o derecho inscrito”. Empire Life Ins. Co v. Registrador, supra, pág. 142. Utili-zar ese método para determinar el valor sujeto a arancel, ayuda a acercar el Registro a la realidad del verdadero valor del inmueble y excluye la ficción que representan los valores irrisorios. ESJ Towers, Inc. v. Registrador, supra, pág. 314; Aponte Parés v. Registrador, supra, pág. 178.
De otro lado, la cuestión central planteada por el recurso gubernativo objeto de controversia en Lincoln American Corporation v. Registrador, 106 DPR 781 (1978), era si tenía que cumplirse la orden judicial computando dere- *864 chos de arancel sobre la cantidad realmente desembolsada por el acreedor y recibida por el deudor o si la base para el pago de aranceles debía ser el principal de la hipoteca. So-bre esa interrogante, expresamos que la controversia no puede evadir la regla de Empire Life Ins. Co. v. Registrador, supra, que utiliza el principal de la hipoteca a cancelar como la base racional, lógica y real del cómputo para los derechos de inscripción.
Estos principios habían sido adoptados hace varias décadas en Balbás v. Registrador, 45 DPR 804 (1933), donde se descartó el precio de adjudicación en subasta y se utilizó el valor del derecho hipotecado, es decir, el principal de la hipoteca, para fijar los derechos de inscripción. Esta norma responde al propósito que infiltra el arancel de aproximar en lo posible la base impositiva al valor real del derecho objeto de la operación registra! Al aplicar el arancel del Registro de la Propiedad, el Registrador puede descartar el valor aparente, convenientemente expresado en la escri-tura de venta judicial, por el valor real que satisface la razón y el entendimiento. Empire Life Ins. Co. v. Registrador, supra, pág. 142.
La doctrina y la jurisprudencia han reconocido que la operación del Registro de la Propiedad confronta en la práctica dos realidades: la realidad registral y la extrarregistra! En los casos donde existe alguna discre-pancia entre estas realidades, se puede presumir que existe una ficción que ha accedido al Registro de la Propie-dad o que ha sido presentado para ganar acceso a este. Para evitar estas discrepancias, el Registrador debe usar su facultad para negar acceso a actos artificiosos y para promover la fidelidad óptima en los libros del Registro de modo que se acerque su realidad a la realidad externa. Empire Life Ins. Co. v. Registrador, supra, pág. 141. La calificación se extiende a toda clase de documentos perti-nentes para apreciar la procedencia del asiento, en una conjunción de todos los elementos del título presentado y *865 contenido del Registro. R.M. Roca Sastre, Derecho hipotecario, 6ta ed, Barcelona, Ed. Bosch, 1968, T. II, pág. 260; Empire Life Ins. Co. v. Registrador, supra.
Se ha interpretado y aplicado el arancel del Registro de la Propiedad desde su fijación temprana por la Ley de Aranceles en 1904 hasta la actual Ley Núm. 91 de 30 de mayo de 1970, siguiendo estos principios y normas determinantes del valor real de la finca o derechos. Lincoln American Corp. v. Registrador, supra, pág. 784. Así pues, hemos reconocido que el Registrador de la Propiedad tiene el deber en ley de exigir el pago de arancel como fue dispuesto. Correa Sánchez v. Registrador, 113 DPR 581, 592 (1983).
B. Principio de indivisibilidad
El principio de indivisibilidad de la hipoteca postula que la garantía hipotecaria subsiste íntegra sobre todas y cada una de las partes del crédito mientras este no se cancele. El Art. 173 de la Ley Hipotecaria y del Registro de la Propiedad, 30 LPRA sec. 2569, dispone que:
[l]a hipoteca subsistirá íntegra, mientras no se cancele, so-bre la totalidad de los bienes hipotecarios aunque se reduzca la obligación garantizada, y sobre cualquier parte de los mis-mos bienes que se conserven, aunque la restante haya desapa-recido; pero sin perjuicio de lo que se dispone en las dos si-guientes secciones.
Por su parte, el Art. 174 de la referida ley, 30 LPRA sec. 2570, expresa que
[s]i una finca hipotecada se dividiere en dos (2) o más, no se distribuirá entre ellas el crédito hipotecario sino cuando volun-tariamente lo acordaren el deudor y el acreedor. No verificán-dose esta distribución, podrá repetir el acreedor por la totalidad de la suma garantizada contra cualquiera de las nuevas fincas en que se haya dividido la primera o contra todas a la vez.
No es posible liberar un apartamento de un crédito hipotecario afirmando que no se reduce en forma al- *866 guna ni el principal del pagaré ni de la hipoteca. Si el cré-dito hipotecario o el valor del pagaré no disminuyen, ¿en qué consiste la liberación? Nuestro ordenamiento registral no permite liberar en un asiento la hipoteca y dejar vigente el asiento del derecho real de hipoteca. Ello implicaría burlar el pago de arancel hipotecario y notarial. Casa Blanca Properties v. Registrador de la Propiedad, 130 DPR 609, 616 (1992).
En cuanto a los créditos hipotecarios constituidos y no cancelados antes de la dedicación de un inmueble al Régi-men de Propiedad Horizontal se ha expresado lo siguiente:
En algunos casos los créditos hipotecarios constituidos antes de la dedicación al Régimen de Propiedad Horizontal no han sido debidamente cancelados en el Registro de la Propie-dad antes de presentarse para su inscripción, las escrituras de separación y venta de los apartamientos. El no cancelar los mencionados créditos hipotecarios perjudica a los adquirentes, y al Estado, y aventaja a los acreedores. Ponencias y comuni-caciones presentadas al III Congreso Internacional de Derecho Registral, San Juan, Instituto del Derecho Registral y Notarial de Puerto Rico, 1977 T. I, págs. 489 y 490.
C. Hermenéutica legal
Los tribunales tenemos el propósito de solucionar las controversias y de adjudicar los derechos de las partes en un pleito. Con ese criterio rector en mente debemos remitirnos al texto del Art. 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14, el cual dispone que, cuando la ley es clara y libre de toda ambigüedad, la letra de la ley no debe ser menospreciada bajo el pretexto de cumplir con su espíritu. No hay necesidad de recurrir al subterfugio de indagar más allá de la ley para cumplir con su propósito legislativo cuando el texto de la ley es claro. Asoc. Fcias. v. Caribe Specialty et al. II, 179 DPR 923, 938 (2010).
El lenguaje claro y explícito de un estatuto no se debe tergiversar, mucho menos malinterpretar o sustituir. En ocasiones anteriores hemos dejado claro que los tribu- *867 nales debemos interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes secciones, supliendo así las posibles deficiencias cuando esto sea necesario. Pizarro v. Nicot, 151 DPR 944, 951 (2000). Véase, además: Aquino González v. A.E.E.L.A., 182 DPR 1, 39 (2011). La función de la Rama Judicial no es legislar, sino interpretar las leyes que aprueba la Rama Legislativa y constatar que no estén reñidas con la Constitución. Marbury v. Madison, 5 US 137 (1803). Véanse: Art. V, Sec. 4, Const. ELA, LPRA, Tomo 1; Bomberos Unidos v. Cuerpo de Bomberos et al., 180 DPR 723, 749 (2011).
Así mismo, en un sinnúmero de ocasiones hemos indicado que “[a]nte el lenguaje claro, explícito y libre de toda ambigüedad o duda de un estatuto, no cabe menospreciar la letra de la ley bajo el pretexto de cumplir su espíritu, máxime cuando el espíritu o intención del estatuto son la misma cosa”. Pueblo v. Castro Muñiz, 118 DPR 625, 650 (1987). Véanse, además: Bomberos Unidos v. Cuerpo de Bomberos et al., supra; Rullán Rivera v. A.E.E., 179 DPR 433, 444 (2010); Piovanetti v. S.L.G. Touma, S.L.G. Tirado, 178 DPR 745, 767 (2010). Para reconocer el curso seguido por la autoridad legislativa, es necesario examinar la hermenéutica. Es doctrina arraigada que cuando el lenguaje de una ley es claro y la intención legislativa patente, los tribunales están obligados a respetar la voluntad del legislador. Véanse: Pueblo v. Negrón Rivera, 183 DPR 271, 282 (2011); Raimundi v. Productora, 162 DPR 215, 235 (2004).
Ese proceso de interpretar las leyes, que recibe el nom-bre de hermenéutica legal, consiste en auscultar, averiguar, precisar y determinar cuál era la voluntad legislativa al aprobar la ley. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. JTS, 1987, Vol. 1, pág. 241; IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 738.
*868 Al adentrarse en esa delicada faena, el Poder Judicial debe tener como norte que de todas las reglas de interpre-tación hay solo una que es absolutamente invariable y es que en ese proceso “debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo”. Bernier y Cuevas Segarra, op. cit., pág. 242. Los tribunales somos intérpretes finales de las leyes. En consecuencia, “[n]os en-contramos en la obligación y el deber ineludible de lograr un resultado que se ajuste al propósito y a la política pública que inspiró a la Legislatura al aprobarlas”. IFCO Recycling v. Aut. Desp. Sólidos, supra, pág. 740. Véase Consejo Titulares v. DACo, 181 DPR 945, (2011).
Nuestro ordenamiento jurídico consigna determinadas normas de hermenéutica legal las cuales, en mayor o menor medida, se imponen como principios rectores del ejercicio de la función adjudicativa de los tribunales. Const. José Carro v. Mun. Dorado, 186 DPR 113, 126 (2012).
En Consejo Titulares v. Gómez Estremera et al., 184 DPR 407, 428-429 (2012), tuvimos oportunidad de expre-sarnos sobre la discreción judicial en el contexto de inter-pretación de las leyes. Allí dijimos que
[l]os tribunales estamos autorizados a interpretar las leyes cuando, entre otras, éstas no son claras o concluyentes sobre un punto en particular; cuando el objetivo, al realizarlo, es el de suplir una laguna en la misma; o cuando, con el propósito de mitigar los efectos adversos de la aplicación de una ley a una situación en particular, la justicia así lo requiere [...] (Enfasis en el original). Véase, además, Pueblo v. Ortega Santiago, 125 DPR 203, 214 (1990).
Es un principio elemental de hermenéutica que a toda ley se le dará la interpretación que mejor responda a los propósitos que persigue. Los tribunales deben interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes disposiciones y supliendo las posibles defi- *869 ciencias cuando esto fuere necesario. Sucn. Álvarez v. Srio. de Justicia, 150 DPR 252, 276 (2000). Como corolario de la doctrina, los tribunales, al ejercer su función interpretativa de la ley, deberán considerar el propósito o la intención de la Asamblea Legislativa al aprobarla. Ello, a fines de propiciar la obtención del resultado querido por el legislador originalmente. Piovanetti v. S.L.G. Touma, S.L.G. Tirado, supra.
Como sabemos, suplir estas posibles deficiencias legislativas mediante una interpretación que respete la intención última del legislador, es muy distinto a sustituir la intención legislativa por la del juzgador. Pueblo v. Ruiz, 159 DPR 194, 210 (2003). Según lo resuelto en Pueblo v. Ferreira Morales, 147 DPR 238 (1998), los tribunales debemos interpretar los estatutos teniendo presente el propósito social que los inspiró, dándoles un sentido lógico a sus diversas disposiciones y supliendo posibles deficiencias en los casos en que sea necesario. Sobre la interpretación que puede hacer el juzgador hemos reiterado que
[e]l profundo respeto que nos merece la intención del legisla-dor nos obliga, en determinadas ocasiones, a suplir las inadver-tencias en que éste pueda haber incurrido. Para evitar un re-sultado irrazonable e insostenible, en el pasado no hemos vacilado en aclarar el texto de una ley para conformarlo a la intención legislativa. Es regla dorada de hermenéutica judicial, que las disposiciones de una ley deben ser examinadas e inter-pretadas de modo que no conduzcan a resultados irrazonables e insostenibles, sino armoniosos. (Escolio omitido). Domínguez Castro et al. v. ELA II, 178 DPR 375, 409 (2010).
En reiteradas ocasiones hemos resuelto que las inter-pretaciones de la ley que conduzcan a conclusiones absur-das deben ser rechazadas. Al ejercer la función interpreta-tiva, estamos obligados a armonizar, en la medida posible, todas las disposiciones de ley implicadas en aras de obte-ner un resultado más sensato, lógico y razonable. Asoc. Fcias. v. Caribe Specialty II, supra, pág. 940; Sucn. Álvarez Crespo v. Srio. de Justicia, supra, pág. 276.
*870 Examinado el marco doctrinal y el ámbito de extensión e importancia del cómputo del pago de los derechos de ins-cripción para las distintas transacciones efectuadas en el Registro de la Propiedad, pasemos a resolver las controver-sias específicas que se presentan en los casos de autos consolidados.
I — I HH t — i
En los presentes casos, existen dos escrituras mediante las cuales se realizaron distintas transacciones, entre ellas dos compraventas. La notificación de faltas hecha por la Registradora establece que la transacción de las compra-ventas son las que resultan ser objeto de controversia, pues según su calificación, estas precisaban pagar derechos de aranceles adicionales a los ya pagados.
Como hemos reseñado en los recursos gubernativos ob-jeto de nuestro análisis, estos contemplan varias transac-ciones sobre las fincas que se encuentran gravadas por hipotecas. Según refleja la notificación de faltas, tanto de la Escritura Núm. 2 como de la Núm. 10, el precio de venta de ambas fincas, constituye una cantidad menor que la suma de las hipotecas por las cuales están gravados los inmuebles.
Para la más cabal comprensión de los presentes recur-sos gubernativos es preciso destacar que la edificación co-mercial y el condominio Laguna Plaza fueron conceptuali-zados y son unidades económicas independientes. Para poder financiar la construcción de la estructura total, tanto de la edificación comercial como del condominio Laguna Plaza, SGCP obtuvo préstamos garantizados con hipotecas por la suma de $73,126,636. La Escritura Núm. 2, objeto de calificación y denegatoria de recalificación de la que aquí se recurre contenía los actos siguientes: (1) declara-ción de la existencia de la edificación comercial sobre la finca de 6,098.9650 metros cuadrados; (2) venta de la finca *871 y edificación comercial (pero no del condominio) a San Ge-rónimo Caribe Parking, Inc., una afiliada de SGCP; (3) re-serva de un derecho de superficie sobre la cubierta de la primera y única planta de la edificación comercial, en la que se apoya el condominio y sobre el sótano donde ubican los estacionamientos del condominio Laguna Plaza; (4) ins-cribió trece servidumbres y (5) sometió las nueve plantas construidas sobre la edificación comercial al amparo del derecho de superficie y el sótano donde ubican los estacio-namientos para los residentes de ese condominio al Régi-men de Propiedad Horizontal. Los valores atribuibles a los actos llevados a cabo mediante la Escritura Núm. 2 fueron los siguientes: (1) la edificación comercial —de cuya exis-tencia se dio fe— se valoró en la cifra de $11,000,000, ello en virtud de una carta de valor emitida por los tasadores para esa edificación comercial; (2) la compraventa de la edificación comercial de SGCP a SGC Parking se valoró en $11,000,000; (3) el derecho de superficie sobre la edifica-ción comercial fue valorado en $1,000; (4) las servidumbres fueron valoradas en $1,000 cada una, para un total de $13,000 por las trece servidumbres comprendidas, y (5) el condominio Laguna Plaza fue valorado en $33,065,000. Conforme a lo anterior, el valor total de las transacciones expuestas en la Escritura Núm. 2 ascendió a $55,079,000. Este fue el valor que SGCP utilizó como base para calcular y pagar los derechos de inscripción de $220,270. Es impor-tante destacar que al momento de someter la Escritura Núm. 2 para su inscripción no se había liberado ninguna parte del negocio antes expuesto de la suma total de los préstamos garantizados con hipotecas que se habían obte-nido para financiar la construcción tanto de la edificación comercial como del condominio Laguna Plaza. Así las co-sas, al momento de presentar la referida escritura, tanto la finca y edificación comercial, como el condominio Laguna Plaza estaban gravados con hipotecas que sumaban $73,126,636.
*872 Por otro lado, para poder financiar la construcción de la estructura total, tanto del estacionamiento comercial como del condominio Caribe Plaza, SGCP obtuvo préstamos, ga-rantizados con hipotecas, por la suma total de $95,050,000. A través de la Escritura Núm. 10, SGCP efectuó las tran-sacciones siguientes: (1) declaró la existencia del estacio-namiento comercial sobre la finca de 6,588.8785 metros cuadrados; (2) vendió la finca y el estacionamiento comer-cial a SGCP Parking; (3) reservó un derecho de superficie sobre (i) la cubierta de la octava y última planta del esta-cionamiento comercial, en la que se apoya el condominio y (ii) el sótano donde ubican los estacionamientos del condo-minio Caribe Plaza; y (4) sometió las catorce plantas cons-truidas sobre el estacionamiento comercial al amparo del derecho de superficie y el sótano donde ubican los estacio-namientos del condominio Caribe Plaza; (5) inscribió doce servidumbres; (6) sometió las catorce plantas al amparo del derecho de superficie y el sótano en donde ubican los estacionamientos para los residentes de ese condominio al Régimen de Propiedad Horizontal. Los valores atribuibles a los actos llevados a cabo mediante la Escritura Núm. 10 son los siguientes: (1) el estacionamiento comercial de cuya existencia se dio fe se valoró en la cifra de $19,040,000, según el permiso de construcción para ese estacionamiento y en base al cual se pagaron los correspondientes arbitrios de construcción era por esa cantidad; (2) la compraventa del estacionamiento comercial de SGCP a SGC Parking fue por $19,040,000; (3) el derecho de superficie sobre el esta-cionamiento comercial fue valorado en $1,000; (4) cada ser-vidumbre se valoró en $1,000, ascendiendo a un total de $12,000 por las doce servidumbres, y (5) el condominio Ca-ribe Plaza fue valorado en $86,000,000. Conforme a lo anterior, el valor total de todas las transacciones expuestas en la Escritura Núm. 10 ascendió a $124,093,000. Al mo-mento de someter la Escritura Núm. 10 no se había libe-rado ninguna parte del negocio expuesto de la suma total de los préstamos garantizados con hipotecas que se habían *873 obtenido para poder financiar la construcción tanto del es-tacionamiento comercial, como del condominio Caribe Plaza. Así las cosas, al momento de presentarse la referida Escritura, tanto la finca, el estacionamiento comercial y el condominio Caribe Plaza estaban gravados por hipotecas que sumaban $95,050,000.
Como observamos, la Registradora de la Propiedad uti-lizó e interpretó las disposiciones de la Ley de Aranceles del Registro de la Propiedad de Puerto Rico para hacer las calificaciones. En estos casos aplica la previamente discu-tida Norma Duodécima. De las transacciones efectuadas en las escrituras, resolvemos que las que deben evaluarse con la Norma Duodécima son las compraventas, pues son tran-sacciones que tratan de casos de compraventa de fincas gra-vadas con hipotecas tal y como estipula esa norma. En aras de poder visualizar mejor las transacciones llevadas a cabo en ambas escrituras y los derechos pagados por estas, a continuación presentamos dos tablas que ilustran los dere-chos de inscripción que corresponden a cada transacción, el total en derechos que devenga todo el documento y la defi-ciencia de derechos.
Tabla I. Transacciones de la Escritura Núm. 2
[[Image here]]
(Énfasis suplido). Apéndice, Caso RG-2013-0003, pág. 191.
*874 Tabla II. Transacciones de la Escritura Núm. 10
[[Image here]]
(Énfasis suplido). Apéndice, Caso RG-2013-0004, pág. 303.
A la luz de la información contenida en las tablas, pode-mos colegir que el precio de las hipotecas que gravan las propiedades es mayor que el precio de las transacciones de compraventa efectuadas en ambas escrituras.
Como vimos al analizar el estado de derecho, la Norma Duodécima responde al propósito legislativo de que el arancel se aplique sobre la base que mejor refleja el valor en el mercado de la propiedad transmitida. Véanse: Aponte Parés v. Registrador, supra; Somohano v. Registrador, supra. Por ello, el propósito moderno e irreversible que in-filtra el arancel es aproximar en lo posible la base imposi-tiva al valor real del derecho objeto de la operación registral. Empire Life Ins. Co. v. Registrador, supra; Aponte Parés v. Registrador, supra. Esta jurisprudencia no deja al azar ni a la voluntad de las partes la valoración del derecho de inscripción.
El peticionario, SGCP, nos invita a que, respondiendo al propósito legislativo de la Ley de Arancel del Registro de la Propiedad se tome como base para el cómputo de los aran-celes el precio de venta de la edificación y el terreno que consta en la Escritura Núm. 2 y en la Núm. 10, porque ese *875 es el valor real de la finca. En la búsqueda del verdadero valor de la finca es imprescindible tomar en consideración el hecho de que en este caso se trata de una finca de 1.5517 cuerdas en una zona de alto valor comercial y residencial sobre la cual se construyeron varias edificaciones.
SGCP sustenta su reclamo en cuanto al precio de venta de la finca y de la edificación comercial en la Escritura Núm. 2 con una tasación firmada con los tasadores Luis E. Vallejo y Alberto E. Lanza, quienes indicaron que la cifra de $11,000,000 se refiere a su opinión acerca del “reproduction cost new of the Laguna Plaza residential and comer-cial ground floor and part of the phase II parking basement level which are all in the final stages of construction and from part of the ongoing Paseo Caribe Project, for the preparation of the Declaration of Edification”.(2)
Es evidente que el lenguaje utilizado por los tasadores establece claramente que la suma de $11,000,000 no repre-senta el verdadero valor en el mercado de la finca ni de la edificación. Esa cuantía representa el costo de construcción estimado de la edificación solamente. Es decir, al constar en la Escritura Núm. 2 que el precio de venta de la edifi-cación de la finca es de $11,000,000, es forzoso colegir que al terreno no se le computó o adjudicó valor alguno.
Por otro lado, el peticionario propone “que si se utiliza el valor global de las hipotecas para determinar los derechos de inscripción a pagar, el mismo se debe distribuir propor-cionalmente a través de las transacciones efectuadas”.(3) Más adelante en su escrito, SGCP hace una distribución hipotética de las cargas hipotecarias de la finca a base de un porciento que representa el alegado valor de la finca y la edificación ($11,000,000) sobre el total de la suma del alegado valor de la finca, la edificación comercial y el con-dominio Laguna Plaza.
*876 La Registradora argumenta en su alegato que “no existe disposición alguna en ley ni en la jurisprudencia que esta-blezca que corresponde al Registrador hacer ese tipo de distribución”.(4) En torno a la división de fincas y la distribución de las cargas hipotecarias, el Art. 174 de la Ley Hipotecaria, supra, establece que cuando una transacción como la del presente caso ocurre, las partes involucradas en la compraventa, junto a la comparecencia del acreedor hipotecario, tienen la opción de liberar la finca segregada de las hipotecas o distribuir la carga hipotecaria entre las fincas. Esto tiene el efecto de que la carga hipotecaria ad-judicada a cada finca se ajuste a la realidad y a su valor actual. Siendo así se podría utilizar ese valor como base para el cálculo de los derechos de inscripción arancelarios necesarios para poder ser calificados favorablemente. No obstante, SGCP tuvo disponible la opción de, con la compa-recencia del acreedor hipotecario, liberar la finca y las edi-ficaciones objeto de compraventa, el derecho de superficie y el condominio Laguna Plaza, tal y como provee el Art. 174. A pesar de tener la opción, esa distribución no se hizo, por lo que procede aplicar la Norma Duodécima del Art. 2 de la Ley de Aranceles, supra.
Para la inscripción de la Escritura Núm. 2 se debía valorar la compraventa de la finca y la edificación comercial (que se había llevado a cabo en $11,000,000) en $73,126,636. Ello es así porque el valor de las hipotecas que SGCP había constituido para financiar el desarrollo completo y efectuar todas las transacciones incluidas en la Escritura sumaban en total $73,126,636. Esta es la canti-dad que debía ser tomada como base para el cómputo de los derechos arancelarios de inscripción. Siendo así, faltó un comprobante de $248,376.
De otra parte, para la inscripción de la Escritura Núm. 10 se tiene que valorar la compraventa de la finca y el estacionamiento comercial (que se había valorado en *877 $19,040,000) en $95,050,000. Ello por motivo de que este es el valor de la suma de las hipotecas que garantizan los préstamos para la construcción de la estructura total (es-tacionamiento comercial y el condominio Caribe Plaza). En consecuencia, coincidimos con el criterio de la Registradora de que faltó un comprobante por $303,914 para completar los derechos de inscripción.
IV
Cónsono al propósito legislativo de aproximar la base impositiva para el cálculo del arancel a lo que mejor refleja el valor en el mercado, confirmamos la denegatoria de ins-cripción emitida por la Registradora de la Propiedad, Hon. Marisol Marchand.

Se dictará Sentencia de conformidad.

El Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez no intervinieron.

 En cuanto al segundo defecto, relacionado a incompatibilidades entre la es-critura matriz y los planos o “plot plans”, San Gerónimo Caribe Project, Inc. (SGCP) notificó que someterían documentos para atender ese señalamiento. La Calificación Final en la que se deniega la inscripción notificada el 28 de febrero de 2013 no hace referencia a este asunto. Se incluye referencia a este alegado defecto únicamente para propósitos de trasfondo, ya que la controversia entre el Registro de la Propiedad y SGCP no está relacionada con este asunto.

 Vallejo & Vallejo Real Estate Appraisers and Counselors, Appraisal Report, Anejo III del Recurso Gubernativo.

 Recurso Gubernativo, pág. 2.

 Alegato de la Registradora de la Propiedad, pág. 19.